UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EON SHEPHERD,

                              Plaintiff,

        v.

SUPERINTENDENT W. KEYSER, *et al.*,

                              Defendants.

No. 21-CV-2363 (KMK)

OPINION ORDER

Appearances:

Eon Shepherd
Stormville, NY
*Pro Se Plaintiff*

Owen Crowley, Esq.
NYS Office of the Attorney General
New York, NY
*Counsel for Defendants W. Keyser, S. Keyser,
Venettozzi, Sipple, Terwilliger, Wolff-Friedman,
and Rosenberger*

KENNETH M. KARAS, United States District Judge:

        Eon Shepherd ("Plaintiff"), proceeding pro se, brings this Action against Superintendent

W. Keyser ("Superintendent Keyser"), Captain Maxwell ("Maxwell"), OSI S. Keyser ("OSI

Keyser"), Deputy Superintendent J. Krom ("Krom"), Director of the Solitary Housing Unit

Venettozzi ("Venettozzi"), DSS Sipple ("Sipple"), SGT. Terwilliger ("Terwilliger"), Facility

Health Service Director Wolff-Friedman  ("Wolff-Friedman"), D. Hinton ("Hinton"), C.O.

Rosenberger ("Rosenberger"), John/Jane Doe ("Doe") (collectively, "Defendants"), pursuant to

42 U.S.C. § 1983, alleging that Defendants violated his rights under the First, Eighth, and

Fourteenth Amendments.  (*See* Compl. (Dkt. No. 2).)[1]  Before the Court is Defendants' Motion

to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) (the "Motion").[2]

(*See* Not. of Mot. (Dkt. No. 88).)  For the following reasons, Defendants' Motion is granted in

part and denied in part.

I. Background

A. Factual Background

1.  The Parties

Plaintiff, a Rastafarian, (*see* Compl. ¶ 33), is "a prisoner serving an indeterminate

sentence" who is currently confined at Green Haven Correctional Facility, (*id.* ¶ 1).[3]  At all times

relevant to this Action, Plaintiff was incarcerated at Sullivan Correction Facility ("Sullivan").

(*See id.* ¶¶ 2–7.)

Superintendent Keyser, the superintendent at Sullivan, was "legally responsible for the

day to day operations" of the correctional facility, "including but not limited to the training and

---

[1] In the Complaint, Plaintiff refers to Terwilliger as "Terwillinger," (Compl. ¶ 7), Wolff-Friedman as "Wolff," (*id.* ¶ 9), and Rosenberger as "Rothensberg" or "Rosenberg," (*id.* ¶¶ 10, 43).

[2] Defendants note that Hinton "has been served and requested representation" from the Attorney General of the State of New York (the "Attorney General"), but that the Attorney General "does not yet represent them."  (*See* Defs. Mem. in Supp. of Mot. ("Defs' Mem.") 11 n.1 (Dkt. No. 89).)  Nevertheless, Defendants request that the Court sua sponte dismiss the claims against Hinton for the same reasons they assert in the instant Motion.  However, "[i]t is well-established that '[d]efendants do not have standing to move to dismiss the substantive claims not actually asserted against them.'"  *Griffin v. City of New York*, No. 22-CV-8521, 2025 WL 2198715, at *5 (S.D.N.Y. Aug. 1, 2025) (quoting *Bd. of Managers of Trump Tower at City Ctr. Condo. v Palazzolo*, 346 F. Supp. 3d 432, 462 n.4 (S.D.N.Y. 2018)).  To the extent that Hinton, once represented, wishes to move to dismiss any claim asserted against them, they may request leave from the Court to do so.  The Court therefore denies the Motion to the extent it requests dismissal of claims made against Defendants not party to the instant Motion.

[3] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

supervision of all its employees and personnel." (*Id.* ¶ 2.) Also employed at Sullivan were Maxwell, a captain, (*id.* ¶ 3), OSI Keyser, Superintendent Keyser's nephew who was "employed by the Office of Special Investigation [("OSI")] assigned to the K-9 unit," (*id.* ¶¶ 4, 22), Krom, a deputy superintendent, (*id.* ¶ 5), Venettozzi, the Director of the Special Housing Unit ("SHU"), (*id.* ¶ 8), Rosenberger, a correctional officer, (*id.* ¶ 10), Wolff-Friedman and Hinton, who "were assigned as plaintiff's health care providers," (*id.* ¶ 9), and Sipple and Terwilliger, who were "high ranking officials assigned at Sullivan and [G]reen Haven prison," (*id.* ¶ 7).

       2.  <u>The March 2019 K-9 Search</u>

On March 3, 2019, Plaintiff and several other prisoners "walked out of [a] housing unit" and were "ordered" by Terwilliger "to line up and face the wall." (*Id.* ¶ 12.) Accompanied by K-9-05, a "[b]lack spotted dog," (*id.* ¶ 5), OSI Keyser walked down the corridor where the prisoners were standing, (*id.* ¶ 13). Plaintiff "witnessed . . . the K-9 stick his nose up several prisoners['] asses." (*Id.*) When the K-9 reached Plaintiff, the K-9's "nose was shoved up [P]laintiff's ass for several seconds where [P]laintiff felt the [K]-9 nose on his anal hole." (*Id.*) When Plaintiff "began to protest" to OSI Keyser and Terwilliger, "requesting the [K]-9 nose be removed and that they stop[,] Plaintiff was ordered to shut up and keep still." (*Id.*) K-9-05's "nose remained up [P]laintiff's ass for several more seconds" before the dog moved on to the next prisoner. (*Id.*)

After Plaintiff and the other prisoners were ordered to turn around, OSI Keyser returned with the dog, who was "sniffing other prisoner's crotch area." (*Id.* ¶ 14.) When the dog reached Plaintiff, the dog's "nose was touching [P]laintiff's penis, and the K-9 began sniffing under [P]laintiff's testicles." (*Id.*) Plaintiff again complained "that the dog was sexually molesting him" and was again "ordered to shut up." (*Id.*) Next, OSI Keyser and Terwilliger ordered

Plaintiff "to take his dread locks out of his crown in order for the [K]-9 to sniff [P]laintiff's hair." (*Id.*)  Plaintiff refused, "making OSI Keyser and Terwilliger aware that it was against his religion to have the [K]-9 sniff his hair, as it was also unhygienic and unsanitary."  (*Id.*)  Following his complaints that the dog was "sexually molesting" him, Plaintiff was "removed from the area." (*Id.* ¶ 15.)

Plaintiff alleges that Superintendent Keyser, Sipple, and various John/Jane Does were also present for this incident but did "nothing to refrain OSI Keyser from sexually assaulting/molesting [P]laintiff" or from violating his religious beliefs.  (*Id.* ¶¶ 15, 35.)

At some point shortly after the incident, Plaintiff filed numerous grievances "regarding being sexually molested/assaulted."  (*Id.* ¶¶ 34–36.)  Plaintiff complained in writing to Superintendent Keyser "regarding him failing to refrain his nephew OSI Keyser from violating [P]laintiff's rights" but received no reply.  (*Id.* ¶ 35.)  Plaintiff also complained to Superintendent Keyser in person, who told him that he (the Superintendent) was there during the incident "and the dog did what he was suppose[d] to do."  (*Id.* ¶ 36.)  When Plaintiff objected, Superintendent Keyser said "the dog can do what he wants and that [Plaintiff] was only setting [him]self up for trouble by writing grievances against [Superintendent Keyser's] nephew."  (*Id.*)

### 3. Plaintiff's Wife Attempts to Visit

On April 6, 2019, Plaintiff's wife came to the facility to visit him.  (*Id.* ¶ 16.)  After OSI Keyser and K-9-05 "attempted to sniff/search" his wife, she informed them "she cannot be searched by the dog because she has a fear of dogs and experiences panic attacks, as well as a heart condition, and has a doctor's note stating she had [a] fear of dogs."  (*Id.*)  Plaintiff's wife informed them that when she visited the facility in the prior December, after she made a different K-9 handler "aware of her fear of dogs," that officer had "searched her without the K-9 and

instructed her to bring a letter from her doctor the next time she visited." (*Id.* ¶ 17.) OSI Keyser and a John Doe then asked Plaintiff's wife who she was visiting, and, when she told them Plaintiff's name, they "stated that [P]laintiff is the inmate who filed a grievance about being sexually molested and began laughing." (*Id.* ¶ 18.)

OSI Keyser and John Doe then contacted their watch commander, who informed Plaintiff's wife "that if she cannot follow the rules, she cannot visit [P]laintiff." (*Id.* ¶ 19.) Plaintiff's wife repeated to the watch commander what she was told by the K-9 officer in December 2018, and further stated she "was willing to be stripped searched [sic] as well as submit to an ION scan" rather than be searched by the dog. (*Id.* ¶¶ 19–20.) The watch commander told her "those are not the rules and to leave prison and tell your husband to stop writing grievances against the K-9 officer." (*Id.* ¶ 20.) Plaintiff's wife was then escorted to the processing area where she waited for the van to leave. (*Id.*) After she was waiting for a few hours, the watch commander approached her and told her she could not return to Sullivan until she requested accommodations from the superintendent to be searched in an alternate method. (*See id.*)

When Plaintiff's wife stated "she did nothing wrong to be denied her visit," the watch commander told her "if she gets [P]laintiff to drop his grievance against the K-9 unit for sexual molestation, she will be allowed to visit [P]laintiff," but that "nothing will be done until then." (*Id.* ¶ 21.) OSI Keyser then approached Plaintiff's wife, laughing, and stated "you still scared of dogs, have your husband drop that grievance." (*Id.*)

4. <u>Retaliatory Search</u>

On or about March 18, 2019, Maxwell called Plaintiff down to his office and informed him that Maxwell was aware of the grievance Plaintiff had filed against OSI Keyser, as well as a

lawsuit Plaintiff filed regarding his "hair being touched." (*Id.* ¶ 22.) Maxwell requested that

Plaintiff drop both the grievance and the lawsuit, telling Plaintiff he would "leave [him] alone" if

he did, and "stating he wanted [P]laintiff to work for him as a snitch." (*Id.*) When Plaintiff

refused, Maxwell stated he would "get [P]laintiff . . . and w[ould] set [P]laintiff up with

contraband." (*Id.*)

The following month, on April 22, while Superintendent Keyser, Maxwell, and John

Does were present, Plaintiff was stopped while going to evening recreation and "ordered to face

the wall with several other prisoners." (*Id.* ¶ 23.) Plaintiff was not wearing "his hair covering"

at the time because "it was washed and still wet," but instead had tucked his hair "into his sweat

pants and shirt." (*Id.*) Although "Plaintiff attempted to pull his hair out of his sweat shirt and

pants to avoid the [K]-9 from touching his hair," OSI Keyser bypassed the other prisoners and

instead approached Plaintiff, "where the K-9 jumped on [P]laintiff's hair, hooking his paws into

[P]laintiff's hair, [and] tearing/ripping his hair." (*Id.*)

Plaintiff was then handcuffed and taken to intake where he was "stripped[,] frisked and

ordered to spread his hair," to which he complied. (*Id.* ¶¶ 23–24.) The Sullivan staff watching

"observed [P]laintiff spreading his hair as much as possible." (*Id.* ¶ 24.) After Plaintiff finished,

he was told to get dressed and then was placed in a holding pen. (*Id.*) Maxwell and other

officers approached and informed Plaintiff they had "received [permission] from the

[Department of Corrections and Community Supervision] counsel in Albany to physically search

[P]laintiff's hair." (*Id.*)

Plaintiff was then taken to the facility clinic to have the search performed and recorded

on video. (*See id.* ¶ 25.) When Maxwell requested Plaintiff "give him the contraband in his

hair," Plaintiff told him that "he did not have any contraband and asked who informed him of

such." (*Id.*) Maxwell then informed Plaintiff that he would "shackle [P]laintiff down and physically search his hair," although "Plaintiff made Maxwell aware that it was a violation of his religious right for his hair to be physically searched." (*Id.*) Maxwell told Plaintiff he was aware of Plaintiff's pending lawsuit regarding his hair being searched, then "looked at the officer recording the events," who "turned the camera off and left the room." (*Id.*)

At that point, unrecorded, Maxwell again told Plaintiff that he could "help" him if Plaintiff became a snitch and dropped the grievance against the K-9 unit. (*Id.* ¶ 26.) After Plaintiff refused, Maxwell stated: "this is how you want to play it, you will be my last bust." (*Id.*) Maxwell then "grabbed [P]laintiff's hair, tearing/ripping it in the process," before reaching into his (Maxwell's) back pocket and "pull[ing] out a piece of plastic." (*Id.*) Maxwell walked to the door with the plastic and "stated to the officer that [P]laintiff gave hi[m] two marijuana sticks." (*Id.*) Although Plaintiff stated that Maxwell "was a liar" and denied having the contraband, Plaintiff was "returned to his holding pen, his urine taken, and placed in [the] SHU." (*Id.*)

### 5. The Misbehavior Hearing

On or around April 24, 2019, Plaintiff was issued a misbehavior report. (*Id.* ¶ 27.) Plaintiff requested assistance with the report, which he received, but also requested access to his attorney prior to his misbehavior hearing, which he never received. (*Id.*)

Several days later, at the hearing, Krom "read the charges" and asked how Plaintiff pled, which was not guilty. (*Id.* ¶ 28; Pl's Opp. 2 (clarifying that Krom presided as the hearing officer).)[4] Although Krom acknowledged Plaintiff's prior request to access his attorney, he

---

[4] Plaintiff does not specifically note in the Complaint that Krom is the hearing officer, but does so in his Opposition. Because "the Court's mandate to read the papers of pro se litigants

commenced the hearing without providing that access.  (Compl. ¶ 28.)[5]  Krom then played the video of Plaintiff and Maxwell in the clinic room, which "at no time . . . show[ed] [P]laintiff giving Maxwell anything."  (*Id.*)  Krom further "alleged that [P]laintiff requested to speak to Maxwell off camera," despite the video not depicting this.  (*Id.*)

When the hearing recommenced after a brief adjournment, Plaintiff informed Krom that the contraband testing and test results were obtained "not in compliance with the directive," and requested that the misbehavior report be dismissed.  (*Id.* ¶ 29.)  Plaintiff also requested a copy of the "form 1190" that should have detailed the reason for the search of his hair and informed the hearing officer that that search was not in compliance with another directive.  (*Id.*)  These requests were denied or ignored.  (*Id.*)[6]  At the conclusion of the hearing, Plaintiff was "found guilty and issued a penalty of 75 days in [the] SHU, loss of phones, commissary and packages, as well as 6-months loss of visitation."  (*Id.* ¶ 31.)

Plaintiff submitted written objections to the hearing and appealed to Venettozzi regarding the "due process violations" that occurred during the hearing.  (*Id.* ¶¶ 31–32.)  After Venettozzi affirmed the decision, Plaintiff filed an Article 78 proceeding in Albany County Supreme Court.  (*Id.* ¶ 32.)  On November 18, 2020, while the Article 78 proceeding was pending, Venettozzi

---

generously makes it appropriate to consider [a] plaintiff's additional materials, such as [the] opposition memorandum, to the extent that those allegations are consistent with the [Complaint]," the Court will take that fact into account.  *Fecteau v. City of Mount Vernon*, No. 23-CV-9173, 2025 WL 873018, at *1 n.4 (S.D.N.Y. Mar. 20, 2025) (internal quotation marks omitted); *see also Floyd v. Rosen*, No. 21-CV-1668, 2022 WL 1451405, at *3 (S.D.N.Y. May 9, 2022) (considering exhibits attached to pro se opposition memorandum).

[5] Krom also denied Plaintiff's request to access information regarding how the K-9 was trained as well as the directive regarding K-9 searches.  (*Id.* ¶ 28.)

[6] Krom also denied Plaintiff's request to call as a witness "the judge from his civil litigation and the assistant attorney general," as well as Plaintiff's request to submit into evidence the letters he wrote those two parties, which allegedly outlined Maxwell's threat to set him up.  (*Id.* ¶ 30.)

"administratively reversed [P]laintiff's hearing," after Plaintiff had already served his time in the SHU and had been deprived of visits for six months.  (*Id.*)

### 6. The March 2020 K-9 Search

On or about March 12, 2020, Plaintiff was heading to Rastafarian religious services when he and other prisoners were ordered to line up and face the wall.  (*Id.* ¶ 33.)  OSI Keyser and K-9-05 began searching the other prisoners.  (*Id.*)  Plaintiff informed OSI Keyser "that he was scared," because "this was the very same dog who initially sexually molested [him] and ripped his hair," and requested that the dog not be allowed to touch his body.  (*Id.*)  However, OSI Keyser ordered Plaintiff to face the wall and "began shoving the dog's nose up [P]laintiff's ass," and continued to do so even when Plaintiff protested.  (*Id.*)  Plaintiff was then ordered to turn around and "the dog's nose began touching [P]laintiff's penis and testicles[ and] under his testicles for several seconds."  (*Id.*)  OSI Keyser then stated "that [P]laintiff can file another grievance against him but that will not stop him from having his dog's nose up [P]laintiff's ass and testicles."  (*Id.*)

Plaintiff alleges that he has "experienced countless night[s] without sleep, stress and mental anguish due to the above stated violations."  (*Id.* ¶ 37.)

### 7. Denial of Medical Care

Plaintiff also alleges that he suffers from numerous health conditions.  Specifically, he alleges that he suffered a "severe lower back injury to his lumbar spine and several large herniated disc[s,] which leaves him with chronic back spasms and excruciating pain."  (*Id.* ¶ 40.)  To deal with this condition, he was prescribed "a lumbar spine back brace to assist him in sitting up," and—because the "State mattress exacerbates his pain"—"a[n] egg-crate mattress to assist him in sleeping without pain and discomfort."  (*Id.* ¶ 40; *see also id.* ¶ 50).  Additionally, he was

also diagnosed with glaucoma, "which leaves his eyes extremely sensitive to the lights, causing chronic migraine headaches, double[] blurry vision, eye pain/discomfort" and was accordingly prescribed "dark tinted glasses as well as a permit to wear his personal dark tinted glasses." (*Id.* ¶ 41.) He also alleges that he "suffers from right knee instability" and requires a "right ACL brace for stability and support," and has "painful hammer toes on both feet," and requires "medical boots" and a walking cane" to ambulate. (*Id.*) Finally, he also was "prescribed dentures due to missing teeth." (*Id.*)

On October 29, 2018, Plaintiff was required to be handcuffed and shackled for a court trip. (*Id.* ¶ 42.) Although Plaintiff informed Rosenberger that he needed "the use of big boy cuffs/shackles," Rosenberger "disregarded [P]laintiff" and used the regular cuffs and shackles again, ignoring Plaintiff's complaints that they were too tight. (*Id.*) Rosenberger then escorted Plaintiff to the back of the bus and took his walking cane. (*Id.*) The bus drove for several hours picking up other prisoners. (*Id.* ¶ 43.) When Plaintiff requested to use the bathroom at one stop and asked for his walking cane to exit the bus, Rosenberger refused to bring Plaintiff his cane and ordered him to walk up to the front and retrieve it himself. (*Id.*) When Plaintiff attempted to do so, his "knee and/or legs gave out causing him to fall, hitting the right side of his face and body." (*Id.*)

Rosenberger provided no assistance when Plaintiff fell and denied him access to medical attention, informing Plaintiff that he could get medical attention when the bus arrived at Downstate prison. (*Id.* ¶¶ 43–44.) However, upon arriving at Downstate, Rosenberger again

denied Plaintiff's request, instead "mocking [his] pain and discomfort." (*Id.* ¶ 45.) Plaintiff did not receive treatment until the next day.[7]

Additionally, when Plaintiff was relocated from Five Point prisons to Sullivan prison, he received his prescribed egg-crate mattress and was issued a medical permit for its use. (*Id.* ¶ 50.) Several months later, Plaintiff requested a new egg-crate mattress due to his existing one being worn down. (*Id.* ¶ 51.) Although one of Plaintiff's providers submitted a request for a new mattress, several weeks went by without Plaintiff receiving one. (*Id.*) Eventually, he was informed by his provider that Wolff-Friedman had denied Plaintiff's request for a new egg-crate mattress "because it was too costly" and instead issued Plaintiff a "double mattress." (*Id.* ¶ 51.) Although Plaintiff informed his provider that a double mattress would "not offer [him] any relief," he never received a second egg-crate mattress. (*Id.*)

Plaintiff also alleges that he was issued "over the counter medication for his chronic excruciating back pain," which offered him no relief. (*Id.* ¶ 52.) When he made Wolff-Friedman aware of the medication's lack of effect, Wolff-Friedman "refused to prescribe a medication that would offer [P]laintiff relief." (*Id.* ¶¶ 52, 60.)

Plaintiff further alleges that he broke his dark tinted glasses during his November 2018 fall on the bus and that, accordingly, "he was experiencing inability to see, the lights causing great pain and discomfort, and migraine headaches." (*Id.* ¶ 53.) Although he made Wolff-Friedman and the Nurse Administrator aware of this, "he never received any treatment." (*Id.*) Plaintiff also alleges that after he "repeatedly complained" to Hinton and Wolff-Friedman of his eye pain and related symptoms, he was seen by an eye specialist in April 2019, who

---

[7] Plaintiff also alleges several run-ins with various John/Jane Does that are not relevant to the instant Motion. (*See* Compl. ¶¶ 46–48.)

recommended Plaintiff receive "a permit to wear his personal sun-glasses until he was issued new dark tinted glasses." (*Id.* ¶ 54.) However, Hinton and Wolff-Friedman ignored the recommendations and did not offer Plaintiff any other treatment. (*Id.* ¶¶ 54, 60.)

On April 22, 2019, Plaintiff was placed in the SHU and his "walking cane, lumbar spine back brace, knee brace, [b]roken tinted glasses[,] and dentures" were confiscated. (*Id.* ¶ 57.) After being informed that Sipple had to provide authorization for Plaintiff to use his devices and dentures, Plaintiff repeatedly requested such authorization. (*Id.*) Sipple ignored Plaintiff's requests. (*Id.*) Without the use of his dentures, Plaintiff was "unable to eat because it cause[d] him extreme pain," and without the use of his other medical devices, "his knee constantly gave out[,] causing him to fall" and he experienced "excruciating pain . . . from sitting up for prolonged periods, as he was unable to access daily exercise and showers due to not having his walking cane." (*Id.* ¶ 58.)

 On or about May 13, 2019, Plaintiff was moved to another facility. (*Id.* ¶ 59.) Before he was moved, he requested his dentures and other medical devices. (*Id.*) He was given only his walking cane and was "told his other medical devices would follow him to his next facility." (*Id.*) They never did, "caus[ing] him to experience chronic excruciating pain." (*Id.*)

Plaintiff made Wolff-Friedman aware of his various medical needs, including that his medication was ineffective and that he needed protection for his eyes. (*Id.* ¶¶ 60–63.) Wolff-Friedman ignored Plaintiff's request and did not provide Plaintiff with the requested treatment and/or accommodations. (*Id.*) Plaintiff also alleges that although he made Superintendent Keyser aware of this "deficiency of medical care" and informed him that Hinton and Wolff-Friedman had "fail[ed] to provide [Plaintiff] with effective medical treatment for his chronic

back pain" and eye issues, Superintendent Keyser took no corrective or preventive actions.  (*Id.* ¶ 64.)

    B. Procedural History

    Plaintiff filed his Complaint on April 14, 2021, and requested to proceed without payment of fees, (i.e., in forma pauperis ("IFP")).  (*See* Dkt. Nos. 1–2.)  On May 7, 2021, Plaintiff's Complaint was dismissed and his IFP request denied pursuant to the Prisoner Litigation Reform Act's ("PLRA") three-strikes rule.  (*See* Dkt. Nos. 3–4.)  After failing to obtain reconsideration of that decision, (*see* Dkt. Nos. 5–8), Plaintiff paid the requisite filing fees and the Action was reopened, (*see* Dkt. No. 9).

    On December 9, 2021, the Court issued an Order dismissing Plaintiff's claims against K-9-05 as "[a] dog is not a 'person,' and therefore cannot be [sued] under section 1983."  (*See* Dec. 2021 Order 3 (Dkt. No. 11).)  The Court also directed the Clerk of Court to issue summons as to all named Defendants and instructed Plaintiff to "serve the summons and complaint on each Defendant within 90 days of the issuance of the summonses," warning Plaintiff that failure to timely do so could result in dismissal under Federal Rules of Civil Procedure 4 and 41.  (*Id.* at 3–4.)  Finally, as to the John/Jane Doe Defendants, because Plaintiff did "not supply sufficient information to permit the attorney for or agent of the Doe Defendants to identify them," the Court declined to issue an order under *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1977), to ascertain the identities of the Doe Defendants.  (*Id.* at 4.)

    Summonses were issued on December 10, 2021.  (*See* Dkt. Nos. 12–22.)  On January 20, 2022, and again on March 29, 2022, Plaintiff asked the Court for an extension of time to serve the summons and Complaint due to his incarcerated status.  (*See* Dkt. Nos. 23–24.)  The Court granted Plaintiff an extension until June 23, 2022, to serve Defendants.  (*See* Dkt. Nos. 25–26.)

On June 29, 2022, and September 21, 2022, Plaintiff again wrote the Court, requesting guidance on how to serve Defendants given his incarcerated status and that he did "not have anyone who can serve the [D]efendants." (Dkt. Nos. 28–29).) The Court granted a further extension to November 23, 2022, and directed Plaintiff to the Southern District of New York's pro se intake office for assistance. (Dkt. Nos. 30, 33.) Plaintiff failed to serve Defendants by the deadline, instead again requesting the Court's assistance in how to serve. (Dkt. Nos. 36–37.)

On November 1, 2023, after the Court issued an order to show cause as to why the Action should not be dismissed, to which Plaintiff responded, (*see* Dkt. Nos. 38–39), the Court issued a *Valentin* order directing the Attorney General to provide the addresses where Defendants may be served and granting Plaintiff an extension of time to serve until 60 days after the Attorney General's response, (*see* Dkt. Nos. 40–41).

By December 14, 2023, after requesting and receiving extensions of time to respond, the Attorney General provided the requisite mailing addresses. (*See* Dkt. Nos. 42–45.) On January 20, 2024, Plaintiff informed the Court that all Defendants had been served. (*See* Dkt. No. 46.) Defendants contested that service was properly made, noting that Plaintiff served the summons and complaint "by certified mail . . . rather than by first-class mail," as well as other defects. (*See* Dkt. No. 49.)

After additional back and forth with Plaintiff, (*see* Dkt Nos. 50, 54–56), and citing the "solicitude to which pro se litigants like Plaintiff are generally entitled," the Court again extended Plaintiff's deadline to properly effectuate service, (*see* Dkt. No. 57). Although various service issues persisted, including alleged issues with the addresses provided by the Attorney General, Plaintiff eventually served all Defendants. (*See* Dkt. Nos. 59–81.)

In response to a pre-motion letter from Defendants, the Court set a briefing schedule for Defendants' instant Motion.  (*See* Dkt. Nos. 78, 82.)  Pursuant to that schedule, Defendants filed their papers on January 1, 2025.  (*See* Not. of Mot.; Defs' Mem.)  After receiving another extension, Plaintiff filed his Opposition on April 14, 2025.  (*See* Pl's Opp. to Mot. ("Pl's Opp.") (Dkt. No. 93).)  Defendants filed their Reply on May 14, 2025.  (*See* Reply in Supp. of Mot. ("Reply") (Dkt. No. 94).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [the plaintiff's] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp.

16

2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

### B. Analysis

As relevant here, Plaintiff asserts fifteen claims under the First, Eight, and Fourteenth Amendments.  (*See* Compl. at 22–25.)  Defendants move to dismiss: (1) all claims asserted against Defendants in their official capacities on the grounds of Eleventh Amendment immunity, (*see* Defs' Mem. 35); (2) all of Plaintiff's claims on the grounds that service was completed well after the expiration of the statute of limitations, (*see id.* at 19–22); (3) Plaintiff's claims related to the alleged sexual assault on the grounds that K-9-05 is not a person and thus, Plaintiff has not alleged an underlying constitutional violation, (*see id.* at 23–24); (4) Plaintiff's retaliation claims, as Plaintiff has not alleged any adverse actions, (*see id.* at 24–27); (5) Plaintiff's due process claims against Krom and Venettozzi, because Plaintiff has not adequately alleged their personal involvement, (*see id.* at 27–30); (6) Plaintiff's deliberate indifference claims, as Plaintiff has not alleged sufficiently serious injuries or demonstrated the requisite state of mind, (*see id.* at 30–32); and (7) Plaintiff's failure to supervise or intervene claims, as Plaintiff has not alleged an underlying constitutional violation, (*see id.* at 32–33).

The Court addresses each of Defendants' arguments in turn.

#### 1.  Eleventh Amendment Immunity

As the outset, Defendants argue that to the extent Plaintiff asserts any of his claims against Defendants in their official capacities, those claims must be dismissed because they are barred by the Eleventh Amendment.  (Defs' Mem. 35.)  The Court agrees.

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (quotation marks and alteration omitted).  New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983.  *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (same). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F.3d at 366.  The Eleventh Amendment therefore also bars the claims for damages against the individual Defendants in their official capacities.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985), *aff'd*, 589 F. App'x 28 (2d Cir. 2015)); *Akinlawon v. Polonco*, No. 21-CV-2621, 2025 WL 887621, at *9 (S.D.N.Y. Mar. 21, 2025) (dismissing any claims for damages asserted against individual defendants in their official capacities); *Samuels v. New York Dep't of Lab.*, No. 23-CV-8004, 2025 WL 27737, at *4 (S.D.N.Y. Jan. 3, 2025) (dismissing claims for damages asserted against individual defendants in their official capacities as "barred by Eleventh Amendment immunity").

Accordingly, the following analysis applies only to the claims asserted against Defendants in their individual capacities.

2. <u>Statute of Limitations</u>

Next, Defendants assert that all of Plaintiff's claims are time-barred.  Specifically, although Defendants acknowledge that Plaintiff timely filed this suit on March 15, 2021, within the three-year statute of limitations for his claims, they argue that because "he failed to properly serve Defendants until August 8, 2024, 515 days after the statute of limitations expired," allowing the case to move forward would "circumvent the statute of limitations and unduly prejudice Defendants."  (*See* Defs' Mem. 19–20.)

The Federal Rules of Civil Procedure establish that "[t]he plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m)."  Fed. R. Civ. P. 4(c)(1).  Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).  However, the Court "must extend the time for service for an appropriate period" if "the plaintiff shows good cause for the failure," and "[r]egardless whether [the p]laintiff has established good cause, the Court nevertheless retains 'the discretion to grant an extension of time to serve the defendant.'"  *Rosales v. Pepe's Rest. Grp. LLC*, No. 25-CV-1744, 2025 WL 1898601, at *6 (S.D.N.Y. July 9, 2025) (quoting first Fed. R. Civ. P. 4(m) and then *Hahn v. Off. & Pro. Emps. Int'l Union*, 107 F. Supp. 3d 379, 382 (S.D.N.Y. 2015)); *see also Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) (holding "that district courts have discretion to grant extensions even in the absence of good cause").

As detailed above, Plaintiff received myriad extensions to serve Defendants and repeatedly failed to do so.  (Supra Section I.B.)  Defendants assert that this failure prejudiced them and functionally circumvents the statute of limitations, as Defendants did not receive actual

notice of the lawsuit until late 2023, after the statute of limitations expired.  (*See* Defs' Mem. 21–22.)  Plaintiff, in turn, argues that he had good cause and excusable neglect due to his incarceration and his visual impairment.  (Pl's Opp. 6–7.)

Because the Court has "wide latitude . . . in deciding when to grant extensions on time to serve, . . . even absent good cause," *Gerena v. Korb*, 617 F.3d 197, 201 (2d Cir. 2010), the Court need not decide here whether Plaintiff has made that showing.  Instead, the Court notes that, despite Plaintiff's failures to timely serve—and the extensive time gap between filing and serving—Plaintiff was in frequent communication with the Court, requested guidance at several turns, and seemingly attempted to effectuate service to the best of his ability.  (*See* supra Section I.B.)  Moreover, although Defendants did not receive notice of the lawsuit until 2023, the Court's *Valentin* Order did put them on notice before service was finally executed.  (*See* Dkt. Nos. 40–41.)  Finally, the Court notes "that litigation should generally be resolved on the merits" and concludes that any prejudice to Defendants caused by the delay is outweighed by the prejudice to Plaintiff if the Court dismisses the Complaint on these grounds, as "the applicable statute of limitations would bar the refiled action."  *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *10 (S.D.N.Y. Mar. 26, 2015) (granting an extension to serve in the absence of good cause).

Accordingly, and keeping in mind the special solicitude accorded to pro se plaintiffs, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006),[8] the Court reiterates its

---

[8] Defendants urge the Court to overlook Plaintiff's pro se status, characterizing him as a "serial frivolous filer in Federal Court."  (*See* Defs' Mem. 22.)  Although there sometimes exist "circumstances under which the solicitude ordinarily afforded a pro se plaintiff are withdrawn," *Mongiello v. HSBC Bank USA NA as Tr. for LMT 2006-6 Tr. Fund*, No. 24-CV-2291, 2025 WL 674345, at *1 n.1 (S.D.N.Y. Mar. 3, 2025), the Court does not find that Plaintiff's filings yet reach the level (either in volume or frivolity) that would warrant a withdrawal of that solicitude

prior determinations that the extensions were warranted, *see e.g.*, *Rosales*, 2025 WL 1898601, at *7 (finding an extension was, in part, "warranted in light of [the plaintiff's] continued efforts to timely effectuate service"); *Britt v. Chief Pub. Def. Off.*, No. 24-CV-1584, 2025 WL 1207539, at *8 (D. Conn. Apr. 25, 2025) ("When it appears that proper service may still be obtained, the Second Circuit cautions against dismissal[, and] [i]n light of this guidance, district courts in this Circuit often give *pro se* litigants a chance to serve defendants properly before dismissing their cases" (italics, internal quotation marks, and citations omitted)); *see also Kennedy v. Peters*, No. 23-CV-195, 2023 WL 5977237, at *3 (N.D.N.Y. Sept. 14, 2023) ("[W]hen it comes to technical problems with service, the Second Circuit has held that *pro se* plaintiffs should be granted special leniency. . . .  In short, dismissal is an inappropriate remedy if it appears that proper service may still be obtained." (internal citations and quotation marks omitted)).  Thus, the Court will analyze Plaintiff's claims on their merits.

### 3.  Eighth Amendment: Sexual Assault

Plaintiff's first three claims revolve around the alleged sexual assaults that occurred in March 2019 and March 2020:  (1) that OSI Keyser failed to train K-9-05, causing Plaintiff to be sexually assaulted; (2) that OSI Keyser and Terwilliger allowed defendant K-9-05 to sexually assault Plaintiff; and (3) that OSI Keyser, Superintendent Keyser, DSS Sipple, and Terwilliger allowed defendant K-9-05 to sexually assault Plaintiff.  (*See* Compl. at 22.)

---

here, *see, e.g.*, *Azzarmi v. Neubauer*, No. 20-CV-9155, 2024 WL 4275589, at *2–4 (S.D.N.Y. Sept. 24, 2024) (withdrawing pro se solicitude where plaintiff "ha[d] a *vast* amount of civil litigation experience in federal court[s]" around the country and where plaintiff was under a filing injunction in this District (emphasis in original)), *reconsideration denied sub nom. Azzarmi v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 20-CV-9155, 2025 WL 35003 (S.D.N.Y. Jan. 6, 2025).

"The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." *Colon v. Annucci*, 344 F. Supp. 3d 612, 642 (S.D.N.Y. 2018) (citing *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991)).  "To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015).  "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.'  Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  The Second Circuit has held that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257; *see also id.* (holding that "a single incident of sexual abuse" can constitute cruel and unusual punishment "if sufficiently severe or serious" (citing *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997))).  The "principal inquiry in determining if there was an Eighth Amendment violation 'is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate.'" *Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020) (quoting *Crawford*, 796 F.3d at 257–58)).

Here, Defendants do not argue that the alleged contact during either alleged assault was incidental to legitimate official duties or that it had a justifiable penological purpose.  Instead, Defendants argue only that Plaintiff's claims arising from the alleged assaults must be dismissed as "Plaintiff cannot allege an underlying constitutional violation by K9-05, a dog."  (*See* Defs' Mem. 23–24.)

Defendants are correct as to the first claim—i.e., OSI Keyser's purported failure to train K-9-05. As the Court previously noted, K-9-05 is not a "person" for the purposes of § 1983 and thus, cannot itself commit a constitutional violation. (*See* Dec. 2021 Order 3 (citing, inter alia, *Smith v. P.O. Canine Dogs Chas*, No. 02-CV-6240, 2004 WL 2202564, at *6–7 (S.D.N.Y. Sept. 28, 2005) (police dog is not a person under § 1983)), and *Fitzgerald v. McKenna*, 95-CV-9075, 1996 WL 715531, at *7 (S.D.N.Y. Dec. 11, 1996) (a plaintiff cannot maintain a § 1983 action against a police dog because "animals lack capacity to be sued")).) And because a "claim for failure to train cannot be sustained unless the employees [who were not trained] violated a clearly established federal constitutional rights," this claim fails. *Donahue v. N.Y.C. Transit Auth.*, No. 24-CV-6544, 2025 WL 835759, at *3 (S.D.N.Y. Mar. 14, 2025) (quoting *Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998)); *see also HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *13 n.12 (S.D.N.Y. Sept. 27, 2012) ("[B]ecause no constitutional violation has been established, any claim based on a theory of failure to train or supervise is also dismissed." (citation omitted)); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (absent an underlying constitutional violation, there can be no liability for failure to properly train employees).

However, Defendants misapprehend Plaintiff's other claims. Plaintiff's second and third claims are not merely that OSI Keyser "knowingly allowed defendant K-9-05 to sexually molest/assault plaintiff." (Compl. at 22.) Instead—construing the allegations liberally—Plaintiff's claim is that OSI Keyser *himself* sexually assaulted Plaintiff by *use* of the K-9. (*See* Compl. ¶ 33 ("[OSI] Keyser began shoving the dog's nose up [P]laintiff's ass."); *id.* ¶ 35 ("Superintendent Keyser . . . w[as] present when [P]laintiff was initially sexually assaulted/molested and did nothing *to refrain OSI Keyser from sexually assaulting/molesting*

*[P]laintiff*." (emphasis added)).)  Indeed, "[b]ecause police dogs are law enforcement tools, the

court can analyze an attack from a police dog in a similar manner to an officer's use of any other

law enforcement tool, such as a gun or a nightstick." *Cardona v. Connolly*, 361 F. Supp. 2d 25,

32 n1. (D. Conn. 2005); *cf. Jackson v. County of Ulster*, No. 22-CV-148, 2022 WL 2954370, at

*5 (N.D.N.Y. July 26, 2022) ("[C]ourts have . . . found that the use of a police K-9 to bite, or to

bite and hold, a suspect can constitute a significant degree of force."); *Scott v. Lazure*, No. 19-

CV-713, 2020 WL 2615502, at *6 (D. Conn. May 22, 2020) (denying motion to dismiss an

excessive force claim based on "the use of a police dog" (citation omitted)); *Whitfield v. City of*

*Newburgh*, No. 08-CV-8516, 2015 WL 9275695, at *9–11 (S.D.N.Y. Dec. 17, 2015) (noting a

police dog is a "tool" like a taser and collecting cases describing excessive uses of force

committed through the use of a police dog).

     Defendants fail to substantively engage with these allegations and, apart from their

unsuccessful failure to train argument, offer no argument as to why they should not be held liable

for the assaults allegedly committed by OSI Keyser through use of K-9-05.  (*See generally* Defs'

Mem; Reply.)  Accordingly, the Court denies Defendants' Motion as to Plaintiff's second and

third claims.  *See Akinlawon v. Polonco*, No. 21-CV-2621, 2023 WL 6216724, at *20 (S.D.N.Y.

Sept. 25, 2023) (denying motion to dismiss pro se complaint where defendants "fail[ed] to

engage with [the p]laintiff's allegations," instead only "quoting generic caselaw" and stating that

the plaintiff "failed to plead any non-conclusory allegations"); *see also Whitley v. Bowden*, No.

17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018) (declining to consider

arguments "because [they are] 'not sufficiently argued' by [d]efendants, who are represented by

counsel and attempting to dismiss a pro se Complaint" (quoting *Norton v. Sam's Club*, 145 F.3d

114, 117 (2d Cir. 1998))); *Bonie v. Annucci*, No. 20-CV-640, 2023 WL 2711349, at *17

(S.D.N.Y. Mar. 30, 2023) (declining to consider defendant's argument for dismissal of pro se plaintiff's claim where the argument amounted to "a single three sentence paragraph" that failed to substantively engage with the factual allegations); *cf. Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for [the] [a]ppellant intends that we form an argument for him, by looking into the record to document the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions. But that is simply not our job, at least in a counseled case.").[9,10]

### 4. First Amendment: Retaliation

Next, Plaintiff alleges that Defendants retaliated against him for filing grievances by: (1) allowing K-9 to sexually molest Plaintiff and violate his religious beliefs, (claim four); (2) "setting [Plaintiff] up with contraband," (claim five); and (3) "denying [P]laintiff visitation with his wife," (claim six). (*See* Compl. at 22–23.)

---

[9] Defendants also fail to mention, let alone engage with, Plaintiff's claim that Terwilliger and OSI Keyser, via K-9-05, violated Plaintiff's religious beliefs, (*see* Compl. at 22 (claim two); *see generally* Defs' Mem.; *see generally* Reply), and accordingly, their Motion is also denied as to that claim.

[10] The Court acknowledges that, even if Plaintiff has made out a claim regarding the alleged assault committed by use of K-9-05, Defendants may be entitled to qualified immunity. *See McKinney v. City of Middletown*, 49 F.4th 730, 743 (2d Cir. 2022) (granting qualified immunity to officers that "used a baton, a police canine, and a taser" to subdue an arrestee in a holding cell). However, Defendants here make no specific arguments about why they are entitled to qualified immunity, instead only stating "[i]t was objectively reasonable for Defendants to believe that their conduct . . . was lawful." (*See* Defs' Mem. 34.) Accordingly, because Defendants "make no actual arguments about why they are entitled to qualified immunity" but instead only "cite generic caselaw," the Court will not consider this argument at this time. *Whitley v. Ort*, No. 17-CV-3652, 2018 WL 4684144, at *10 (S.D.N.Y. Sept. 28, 2018) (quoting *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018); *Vega v. Rell*, No. 09-CV-737, 2011 WL 2471295, at *25 (D. Conn. June 21, 2011) ("Absent the defendants' specific legal analysis of the claims and supporting allegations, the court cannot consider the defendants' qualified immunity arguments at this time.").

"The Second Circuit has instructed district courts to view 'prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official[—]even those otherwise not rising to the level of a constitutional violation[—]can be characterized as a constitutionally proscribed retaliatory act.'" *Baltas v. Snyder*, No. 24-CV-1487, 2025 WL 509423, at *4 (D. Conn. Feb. 14, 2025) (quoting *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)).  To state a claim for First Amendment retaliation, Plaintiff is required to plausibly plead: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Samuels v. New York Dep't of Lab.*, No. 23-CV-8004, 2025 WL 27737, at *4 (S.D.N.Y. Jan. 3, 2025) (quotation marks omitted) (quoting *Dolan*, 794 F. 3d at 294).

It is well established that "[t]he first element of a retaliation claim may be satisfied if correctional staff retaliated against a detained individual for 'pursuing a grievance.'" *Wright v. Doe*, No. 24-CV-5711, 2025 WL 41677, at *4 (S.D.N.Y. Jan. 2, 2025) (quoting *Dolan*, 794 F.3d at 294)); *see also Salley v. Capra*, No. 23-CV-4566, 2025 WL 950991, at *5 (S.D.N.Y. Mar. 28, 2025) ("[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" (quoting *Dolan*, 794 F.3d at 294); *Kotler v. Boley*, No. 17-CV-239, 2025 WL 2494289, at *5 (S.D.N.Y. Aug. 29, 2025) ("[I]t is 'well established' that filing inmate grievances is constitutionally protected conduct." (quotation omitted)).  Accordingly, there is no dispute here that Plaintiff has adequately alleged he engaged in protected speech when he submitted numerous grievances regarding the alleged sexual molestation.  (*See* Compl. ¶¶ 34–36.)  *See Salley*, 2025 WL 950991, at *5 (finding plaintiff

26

alleged protected speech where "he submitted a number of grievances regarding prison conditions"); *see also Arriaga v. Annucci*, No. 23-CV-1941, 2024 WL 1743300, at *11 (S.D.N.Y. Apr. 23, 2024) ("Because plaintiff alleges he raised a number of issues . . . by filing grievances on his own behalf . . ., he has sufficiently alleged facts to satisfy the first element [of a First Amendment retaliation claim].").

    "To satisfy the second element, that correctional staff took adverse action against a detained individual, a plaintiff must show that the 'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Wright*, 2025 WL 41677, at *4 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  As for the third prong, "a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action."  *Arriaga*, 2024 WL 1743300, at *11 (alteration adopted) (quoting *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)).

    Here, Defendants do not address, much less mention, Plaintiff's retaliation claim against Maxwell for allegedly setting Plaintiff up with contraband.  (*See generally* Defs. Mem; Reply.)  Accordingly, this claim survives.  *See Garcia v. ROC Nation LLC*, No. 24-CV-7587, 2025 WL 1865965, at *15 (S.D.N.Y. July 2, 2025) (declining to dismiss claim where "defendants offer no arguments . . .why the Court should"); *Adams v. Annucci*, No. 17-CV-3794, 2020 WL 1489787, at *13 (S.D.N.Y. Mar. 27, 2020) ("Because [d]efendants have not addressed this claim, the Court will not dismiss it here."); *Rubenstein v. Cosmos Holdings, Inc.*, No. 19-CV-6976, 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020) (denying motion to dismiss and "declin[ing] to make arguments for dismissal that [d]efendants chose not to present").

As for Plaintiff's other claims, Defendants do not contest causation but assert only that Plaintiff failed to show that he suffered an adverse action.  (*See* Defs' Mem. 26–27.)  The Court considers each claim in turn.

a.  Retaliatory Searches and Sexual Assault

Defendants argue that "because a First Amendment retaliation claim cannot be based on retaliatory cell searches and pat frisks," Plaintiff suffered no adverse action and thus cannot sustain a retaliation claim based on the K-9 sniff search.  (*See* Defs' Mem. 26 (citing *Henry v. Annetts*, No. 08-CV-286, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010)).)  Defendants are incorrect.

"Although incarcerated individuals do not possess a constitutional right to be free from a retaliatory *search*, they may still assert that such a search constitutes an adverse action where retaliatory conduct occurs during that search."  *Hamlett v. Everly*, No. 21-CV-6663, 2023 WL 2586230, at *4 (S.D.N.Y. Mar. 21, 2023); *see also George v. County of Westchester, et al.*, No. 20-CV-1723, 2021 WL 4392485, at *8 (S.D.N.Y. Sept. 24, 2021) (collecting cases).  Plaintiff's claim is not, as Defendants construe it, that he merely suffered a retaliatory search.  It is that, in retaliation for filing grievances, he was sexually assaulted by OSI Keyser *during* a search.  (*See* Compl. ¶ 33 ("[OSI] Keyser began shoving the dog's nose up [P]laintiff's ass . . . [and] stated that [P]laintiff can file another grievance against him but that will not stop him from having his dog's nose up [P]laintiff's ass and testicles.").)

Because sexual assault would likely "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,'" *Wright*, 2025 WL 41677, at *4, the Court concludes that Plaintiff has adequately pled an adverse action sufficient to sustain a retaliation claim, *see, e.g.*, *Hamlett*, 2023 WL 2586230, at *4 (finding that an alleged physical

assault constituted an "adverse action for retaliation purposes"); *LaPietra v. City of Albany Police Dep't*, No. 19-CV-1527, 2020 WL 5891888, at *13 (N.D.N.Y. Oct. 5, 2020) ("[T]he alleged assault constituted an 'adverse action' against [the plaintiff] that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."), *report and recommendation adopted*, No. 19-CV-1527, 2020 WL 7021589 (N.D.N.Y. Nov. 30, 2020); *Rivera v. Goord*, 119 F. Supp. 2d 327, 333, 340 (S.D.N.Y. 2000) (finding assault was "adverse action" where defendant "pinned [plaintiff] against a wall, banging his face into the wall and twisting his arms behind him"). [11]

### b. Denial of Visitation Rights

Next, Defendants argue that Plaintiff did not suffer an adverse action when his wife was barred from visiting him, as "Plaintiff does not have an absolute constitutional right to visitation." (Defs' Mem. 26–27.)

"Restrictions on visitation may, but do not necessarily, amount to an adverse action." *Booker v. Griffin*, No. 16-CV-0072, 2019 WL 13163557, at *6 n.7 (S.D.N.Y. June 7, 2019). Some courts have concluded that "a single denial of visitation, even if intentional and unjustified, is nevertheless unlikely to chill a person of ordinary firmness from continuing to exercise his right to file grievances." *Mateo v. Heath*, No. 11-CV-636, 2012 WL 1075836, at *4 (S.D.N.Y. Mar. 29, 2012); *see also Amaker v. Annucci*, 721 F. App'x 82, 84 (2d Cir. 2018) (summary

---

[11] Plaintiff also alleges that he was subject to retaliatory conduct during searches when first OSI Keyser, via K-9-05, and then Maxwell ripped and tore at Plaintiff's hair in violation of Plaintiff's Rastafarian beliefs. (*See* Compl. ¶ 23 (alleging "OSI Keyser [by]passed all the other inmates . . . and approached plaintiff, where the K-9 jumped on [P]laintiff's hair, hooking his paws into [P]laintiff's hair, tearing/ripping his hair"); *id.* ¶¶ 25–26 (alleging Maxwell "grabbed [P]laintiff's hair, tearing/ripping it in the process" after Plaintiff made "Maxwell aware that it was a violation of his religious right for his hair to be physically searched").) As Defendants again do not address this portion of Plaintiff's claim, (*see generally* Defs' Mem.; Reply), it also survives Defendants' Motion, *see Akinlawon*, 2023 WL 6216724, at *20.

order) (holding that requiring an inmate's visitors to have their photographs taken in order to shorten visitation time was not an adverse action). Others, however, have noted that, "[d]epending on the circumstances under which [the defendant] kept [plaintiff] off the visitor's list," the denial of visitation can constitute an adverse action for the purposes of a retaliation claim. *Chambers v. Johnpierre*, No. 14-CV-1802, 2015 WL 4751134, at *6 (D. Conn. Aug. 11, 2015); *see also Henderson v. Fischer*, No. 12-CV-1704, 2015 WL 1413965, at *14 (N.D.N.Y. Mar. 18, 2015) ("The Court finds for purposes of this motion that [the defendant's] temporary revocation of [p]laintiff's mother's visitation privileges constitutes adverse action for retaliation purposes.").[12]

Here—construing the allegations liberally—Plaintiff alleges that, on her previous visits, his wife was allowed to undergo non-K-9 searches after she explained her debilitating fear of dogs and was informed that she should bring a doctor's note explaining that fear on previous visits. (*See* Compl. ¶ 17.) However, once Plaintiff filed his grievance, prison personnel refused to offer his wife the ability to be searched by alternative means and informed her that she would "not be allowed to visit [P]laintiff" until she "g[ot] [P]laintiff to drop his grievance against the [K]-9 unit." (*Id.* ¶¶ 18–21.) The Court concludes that in these specific circumstances, this functional and indefinite bar on all visits from Plaintiff's spouse plausibly would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional

___

[12] Contrary to Defendants' assertions, (Defs' Mem. 26–27), "[a]n act need not rise to the level of a constitutional violation to be considered an 'adverse action' for a retaliation claim," *Mateo*, 2012 WL 1075836, at *4. Thus, whether or not Plaintiff has a constitutional right to visitation is beside the point. Instead, the appropriate analysis is whether or not the denial of visitation would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Wright*, 2025 WL 41677, at *4.

30

rights,'" *Wright*, 2025 WL 41677, at *4, and thus, is a sufficiently adverse action to sustain a retaliation claim.

Accordingly, Defendants' Motion is denied as to Plaintiff's retaliation claims.

### 5. Fourteenth Amendment: Due Process

Next, Plaintiff alleges that Krom violated Plaintiff's due process rights during the misbehavior hearing and "unlawfully confined [P]laintiff in segregation," and that Vennettozzi "failed to correct the due process violations cause[d] by" Krom. (Compl. at 23, 25 (claims eight and fourteen).) Defendants argue Plaintiff has not pled sufficient facts to conclude that either Krom or Vennettozzi were personally involved in the alleged constitutional violation, (*see* Defs' Mem. 29–30), and, regardless, Plaintiff has not pled a procedural due process violation, (*see* Reply 15–17).

As an initial matter, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *31 (S.D.N.Y. Mar. 26, 2021) (alterations adopted) (quoting *Grullo v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). Here, the sum total of the allegations against Vennettozzi is that he affirmed the hearing decision and then later "administratively reversed" that same decision. (Compl. ¶ 32.) Without more, "Plaintiff has alleged nothing more than Vennettozzi acting in his supervisory role 'in the prison chain of command,' which is insufficient to establish personal involvement." *See White v. Gutwein*, No. 20-CV-4532, 2022 WL 2987554, at *10 (S.D.N.Y. July 28, 2022) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (dismissing claim where the plaintiff alleged only that Vennettozzi, "upon receiving and reviewing [the p]laintiff's appeal in his capacity as the Director of Special Housing, affirmed the

hearing officer's conclusions"); *Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("[T]hat Venettozzi denied [the p]laintiff's administrative appeal[] cannot support the inference that [Venettozzi], through '[his] own individual actions, [have] violated the Constitution.'" (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 615 (2d Cir. 2020)).

In contrast, Plaintiff alleges that Krom directly committed a litany of procedural violations during the misbehavior hearing and, thus, has successfully pled his personal involvement. (*See* Compl. ¶ 28 (noting Krom "read the charges and asked how do [P]laintiff plea [sic]"); *id.* ¶¶ 28–31 (describing the hearing officer's conduct); *see* Pl's Opp. 2, 15–17 (clarifying that Krom was "the hearing officer").) Defendants, however, argue that none of these alleged violations amounts to a deprivation of due process. (*See* Reply 15–17.)

"The due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Brown v. Venettozzi*, No. 18-CV-2628, 2022 WL 3867958, at *7 (S.D.N.Y. Aug. 30, 2022) (quoting *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004)). However, "[a]s the Supreme Court has held, due process requires that in a disciplinary hearing resulting in imposition in loss of good time credits or solitary confinement, an inmate must be afforded advance written notice of the charges against him and a written statement of fact findings supporting the disposition and reasons for the disciplinary action taken." *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (per curiam) (citing *Wolff-Friedman v. McDonnell*, 418 U.S. 539, 563–64 (1974)); *accord Elder v. McCarthy*, 967 F.3d 113, 124 (2d Cir. 2020) (similar). These due process rights are not absolute and accordingly are individually and collectively subject to harmless error analysis. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison

disciplinary proceeding because of a procedural error without making the normal appellate

assessment as to whether the error was harmless or prejudicial.").

The Court need not address Plaintiff's specific objections to the process he received,

however, because his claim fails on a simpler ground: namely, that he has not actually alleged a

protected liberty interest sufficient to give rise to a due process violation.[13]  Plaintiff alleges that

the due process violations resulted in his confinement in the SHU for 75 days.  (Compl. ¶ 31.)

However, courts in the Second Circuit frequently conclude that "punitive segregation conditions

imposed for 101 days or fewer generally do not constitute atypical conditions of confinement."

*Hobes v. Rodriguez*, No. 24-CV-2484, 2025 WL 2324111, at *5 (S.D.N.Y. Aug. 11, 2025)

(quoting *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17,

2015)).  Accordingly, because Plaintiff's sentence was insufficiently long to implicate a liberty

interest, the Court need not address whether Plaintiff received due process in the misbehavior

hearing.  *See Arriaga v. Otaiza*, No. 20-CV-6992, 2021 WL 5449849, at *6–7 (S.D.N.Y. Nov.

19, 2021) (allegations of 90 days of keeplock confinement insufficient to support a liberty

interest); *Ruffin v. Travers-Marsh*, No. 17-CV-2564, 2018 WL 3368726, at *5 (S.D.N.Y. July

10, 2018) (75 days insufficient to implicate a liberty interest); *Williams v. Chuttey*, No. 15-CV-

1278, at *5, 2017 WL 9673722 (N.D.N.Y. Sept. 5, 2017) (noting that 90 days of keeplock

confinement was not a sufficient period of time, without more, to implicate a liberty interest),

---

[13] Defendants do not address whether Plaintiff has alleged a liberty interest.  (*See generally* Defs' Mem.; Reply.)  However, "a district court may dismiss a claim sua sponte if, as is the case here, there is no question as to whether Plaintiff can prevail."  *Kong v. Dajin Realty, Inc.*, No. 23-CV-833, 2023 WL 2597055, at *1 (S.D.N.Y. Mar. 22, 2023); *see also Bailon v. Pollen Presents*, No. 22-CV-6054, 2023 WL 5956141, at *10 (S.D.N.Y. Sept. 13, 2023) ("A district court's ability *sua sponte* to dismiss a [*pro se*] complaint that lacks a basis in law or fact is well-established." (quoting *Muka v. Murphy*, 358 F. App'x 239, 241 (2d Cir. 2009) (summary order))).

*report and recommendation adopted*, No. 15-CV-1278, 2018 WL 1413049 (N.D.N.Y. Mar. 21, 2018), *aff'd*, 767 F. App'x 105 (2d Cir. 2019).

Accordingly, Plaintiff's due process claims against Krom and Venettozzi are dismissed.

      6.   <u>Eighth Amendment: Deliberate Indifference</u>

Finally, Plaintiff alleges that various Sullivan personnel were deliberately indifferent to his medical needs. (*See* Compl. at 24–25.) Specifically, he alleges that: (1) Rosenberger was deliberately indifferent to Plaintiff's medical needs when he "failed to provide [P]laintiff medical treatment for his injuries caused by his falls on the bus" and when he "denied [P]laintiff his walking cane, causing him to fall injuring himself," (Compl. at 24 (claims ten and eleven)); (2) Wolff-Friedman was deliberately indifferent to his medical needs when she failed to treat his "sensitivity to the lights, double blurry vision, eye pain and discomfort, chronic migraine headaches, his pain and discomfort sleeping and provide pain medication for his back that offered hi[m] relief," and "denied plaintiff a medical permit to wear his sun visors," (*id.* at 24–25 (claims nine and thirteen)); and (3) Sipple was deliberately indifferent to his medical needs when he denied Plaintiff "his walking cane, dentures, [and] back/knee brace" during Plaintiff's SHU confinement, (*id.* at 24 (claim twelve)).

As an initial matter, because Defendants do not address Plaintiff's deliberate indifference claims against Rosenberger, (*see generally* Defs' Mem.; Reply), their Motion is denied with respect to those claims, *Garcia*, 2025 WL 1865965, at *15 (S.D.N.Y. July 2, 2025); *Adams*, 2020 WL 1489787, at *13; *Rubenstein*, 2020 WL 3893347, at *11. The Court analyzes the remaining claims in turn.

To state a claim of deliberate indifference, a plaintiff must first "show that, while he was incarcerated, he suffered from a medical condition that is, 'in objective terms, sufficiently

serious.'" *Mallet v. New York State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 132 (2d

Cir. 2025) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see Norman v.*

*Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *7 (S.D.N.Y. July 31, 2020)

("Plaintiff must [first] plausibly allege [ ] that he suffered a sufficiently serious constitutional

deprivation[.]" (internal quotation marks omitted) (quoting *Feliciano v. Anderson*, No. 15-CV-

4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017)).  Second, the plaintiff must plausibly

allege that the defendant "acted with deliberate indifference."  *Norman*, 2020 WL 4432063, at *7

(quoting *Feliciano*, 2017 WL 118747, at *8); *Whitley*, 2018 WL 4684144, at *5 (same).

    "The standard of deliberate indifference includes both subjective and objective

components."  *Mallet*, 126 F.4th at 132 (quoting *Chance*, 143 F.3d at 702).  "The first

requirement is objective:  the alleged deprivation of adequate medical care must be sufficiently

serious."  *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

(citation and quotation marks omitted).  In other words, "the inmate must show that the

conditions, either alone or in combination, pose an unreasonable risk of serious damage to his

health."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted).  Analyzing this

objective requirement involves two inquiries: "whether the prisoner was actually deprived of

adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on*

*other grounds as recognized by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023), and

"whether the inadequacy in medical care is sufficiently serious," which in turn "requires the

[C]ourt to examine how the offending conduct is inadequate and what harm, if any, the

inadequacy has caused or will likely cause the prisoner," *id* at 280 (citation omitted).  "There is

no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's

medical condition."  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Nevertheless, the

Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance*, 143 F.3d at 702); *see also Mallet*, 126 F.4th at 132 (same).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Mallet*, 126 F. 4th at 132 (noting that the "acts or omissions" of the defendant must "evince a conscious disregard of a substantial risk of serious harm" (internal quotation marks and alteration omitted)); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness[,]" and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation, footnote, and quotation marks omitted)). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (citation and quotation marks omitted). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (citation and quotation marks omitted).

a. <u>Wolff-Friedman</u>

Plaintiff contends that Wolff-Friedman was deliberately indifferent to his medical needs when she failed to treat his "sensitivity to the lights, double blurry vision, eye pain and discomfort, chronic migraine headaches, his pain and discomfort sleeping and provide pain medication for his back that offered hi[m] relief." (Compl. at 24.)  Defendants argue that Plaintiff has failed to plead "sufficiently serious injuries" as regards to his eye pain and sleeping discomfort and that, regardless, Plaintiff has failed to plead deliberate indifference. (*See* Defs' Mem. 31–32.)  The Court disagrees.

As for the objective prong—whether Plaintiff alleged sufficiently serious injuries—courts have concluded that, "[d]epending on the circumstances, severe back pain can rise to the level of a serious medical condition." *Liner v. Fischer*, No. 11-CV-6711, 2013 WL 4405539, at *2 (S.D.N.Y. Aug. 7, 2013) (quoting *Thomas v. Connolly*, 10-CV-2401, 2012 WL 3776698, at *26 (S.D.N.Y. Apr. 10, 2012)), *report and recommendation adopted by* 2012 WL 3758457 (S.D.N.Y. Aug. 30, 2012)); *Flemming v. City of New York*, No. 03-CV-662, 2009 WL 3174060, at *8, n. 9 (E.D.N.Y. Sept. 30, 2009) ("Depending on the circumstances, severe back pain may qualify as a 'serious medical need.'"); *Morrison v. Mamis*, No. 08-CV-4302, 2008 WL 5451639, at *8 (S.D.N.Y. Dec. 18, 2008) (noting that, "severe back pain, especially if lasting an extended period of time, and migraine headaches may qualify as "serious medical needs" under the Eighth Amendment" and collecting cases), *report and recommendation adopted*, No. 08-CV-4302, 2009 WL 2168845 (S.D.N.Y. July 20, 2009).  Here, Plaintiff alleges that his "severe lower back injury" causes him "chronic back spasms and excruciating pain," (Compl. ¶ 40), and that without the proper medical equipment (i.e., an egg-crate mattress, back/knee brace, and cane) or proper medication, his legs and knee "continue to give out causing him to fall . . . go out" and his "back

pain and discomfort" is "exacerbate[ed]," and he continues to experience "chronic excruciating back pain," (*id.* ¶¶ 40, 50, 52, 59). The Court thus concludes that Plaintiff has alleged a sufficiently serious "existence of chronic and substantial pain" that "significantly affects daily activities." *Brock*, 315 F.3d at 162 (citation and quotation marks omitted).

Similarly, some courts have found that "glaucoma and the effects of non-treatment may be considered a serious medical condition, considering 'the particular risk of harm faced by [the] prisoner due to the challenged deprivation of care.'" *Liner*, 2013 WL 4405539, at *2 (quoting *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2013)); *see id.* at *7 (noting "eye impairments such as double vision and the loss of depth perception may be serious enough to implicate the Eighth Amendment" and collecting cases); *Palmer v. New York Dep't of Corr.*, No. 13-CV-2529, 2014 WL 1338068, at *4 (S.D.N.Y. Mar. 31, 2014) (noting that, because "[d]iminished eyesight can be sufficiently serious to provide the basis for an Eighth Amendment claim for the denial of medical care," allegations that plaintiff experiences "frequent pain and blurred-blacken double vision" satisfied the objective prong (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996))). And although "not all headaches—even very bad ones—are serious enough to give rise to an Eighth Amendment violation," *Palompelli v. Smith*, No. 20-CV-8070, 2022 WL 624421, at *4 (S.D.N.Y. Mar. 3, 2022) (citation omitted), severe or chronic migraine headaches may "be 'sufficiently serious' to warrant constitutional protection," *De Jesus v. Albright*, No. 08-CV-5804, 2011 WL 814838, at *9 (S.D.N.Y. Mar. 9, 2011); *see also Moriarty v. Neubould*, No. 02-CV-1662, 2004 WL 288807, at *2 n.2 (D. Conn. Feb. 10, 2004) (finding migraine headaches can be sufficiently serious if they are "extremely painful and debilitating"). Thus, the Court also concludes that Plaintiff's alleged glaucoma and attendant issues—which, if untreated "leaves his eyes extremely sensitive to the light, causing chronic migraine headaches, double [] blurry

vision, [and] eye pain/discomfort" and an "inability to see," (Compl. ¶¶ 40–41, 53–54), are sufficiently serious for Eighth Amendment purposes.

As for the subjective prong, Defendants argue that their "conduct is, at worst, negligent," and thus cannot amount to a deliberate indifference claim. However, Plaintiff alleges that he had a medical permit to have an egg-crate mattress for his chronic back pain, and that when his medical provider requested a new egg-crate mattress him, Wolff-Friedman denied the request "because it was too costly." (*Id.* ¶ 51.) In other words, viewing these allegations in the light most favorable to Plaintiff, Plaintiff alleges Wolff-Friedman deliberately ignored Plaintiff's prescription and refused to provide him with the medical device requested by his doctor. At this stage, these allegations are sufficient to state a deliberate indifference claim. *See Ellis v. Kim*, No. 23-CV-05309, 2024 WL 4882702, at *6 (S.D.N.Y. Nov. 25, 2024) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." (quoting *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005))); *Crispin v. Peiri*, No. 21-CV-475, 2023 WL 2931846, at *7 (D. Conn. Apr. 13, 2023) (denying motion to dismiss a deliberate indifference claim where plaintiff alleged a prison official "ignored a recommendation that [plaintiff] be sent . . . for mental health treatment"); *Halperin v. N.Y.C. Dep't of Corr.*, No. 19-CV-6266, 2019 WL 6328775, at *2 (E.D.N.Y. Nov. 26, 2019) ("The failure to comply with prescribed treatment can constitute deliberate indifference to a serious medical need."); *Gaines v. Wright*, No. 17-CV-1513, 2017 WL 4694168, at *6 (D. Conn. Oct. 19, 2017) (finding the plaintiff "alleged a plausible deliberate indifference claim against [d]efendants . . . for failing to provide the prescribed knee brace, without which [the p]laintiff could reasonably be expected to be, and alleges that he was, unstable and as a result suffered an exacerbation of his knee injury and severe pain").

Further, Plaintiff alleges that he was seen by an eye specialist who "recommended [P]laintiff be issued a permit to wear his personal sun-glasses until he was issued dark tinted glasses," but that Wolff-Friedman ignored the recommendations, offered Plaintiff no treatment whatsoever for his eye pain and headaches, and refused to issue a permit to let Plaintiff wear sun visors indoors.  (Compl. ¶¶ 54, 62.)  Again, ignoring a doctor's recommendations and providing no treatment at all is, at this stage, sufficient to make out a claim for deliberate indifference.  *See Ellis v. United States*, No. 23-CV-8350, 2025 WL 895457, at *7 (E.D.N.Y. Mar. 24, 2025) (collecting cases); *see also Wolterstorff v. Quiros*, No. 23-CV-1111, 2024 WL 1603679, at *6 (D. Conn. Apr. 12, 2024) ("Ignoring a doctor's orders is sufficient to state a cognizable claim for deliberate indifference to medical needs."); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *9 (S.D.N.Y. Mar. 29, 2016) (finding that, "[i]n alleging that [defendants] recklessly failed to provide [plaintiff] with *any* medical treatment, the Second Amended Complaint puts forth a plausible claim of deliberate indifference" (internal citations, quotation marks, and alterations omitted)).

Accordingly, Plaintiff has plausibly pled a deliberate indifference claim against Wolff-Friedman.[14]

---

[14] Defendants are correct, however, that Plaintiff's claim that Wolff-Friedman did not prescribe him different, more effective pain medication, (Compl. ¶¶ 52, 60), amounts to only "mere disagreement with a course of treatment," which "is insufficient to state an Eighth Amendment deliberate indifference claim, *Coke v. Koeningsman*, No. 19-CV-10038, 2021 WL 3115438, at *6 (S.D.N.Y. July 22, 2021); *see also Benefield v. MacDougall Med.*, No. 24-CV-1966, 2025 WL 1696223, at *2 (D. Conn. June 17, 2025) ("[A]n inmate's disagreement with a course of medical treatment is insufficient, by itself, to state an Eighth Amendment deliberate indifference claim.").

b. <u>Sipple</u>

Plaintiff's claim against Sipple, however, must fail.  Plaintiff alleges only that he was deprived of his medical equipment while in the SHU and that Sipple ignored his written requests for that equipment.  (*See* Compl. ¶¶ 57–58.)  Such allegations are insufficient to demonstrate Sipple's personal involvement.  *See Maldonado v. Miller*, No. 21-CV-3719, 2024 WL 4043137, at *8 (S.D.N.Y. Sept. 4, 2024) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability under Section 1983." (internal quotation marks and citation omitted)); *Crosby v. Petermann*, No. 18-CV-9470, 2020 WL 1434932, at *10 (S.D.N.Y. Mar. 24, 2020) ("A prisoner's allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." (internal quotation marks and citation omitted)); *Luck v. Westchester Med. Ctr.*, No. 17-CV-9110, 2020 WL 564635, at *11 (S.D.N.Y. Feb. 4, 2020) (noting "mere failure to act on a complaint, without more, fails to state a claim against a Section 1983 defendant" and collecting cases).

Accordingly, Plaintiff's deliberate indifference claim against Sipple is dismissed.

7. <u>Superintendent Keyser</u>

Finally, Plaintiff brings a claim against Superintendent Keyser for "fail[ing] to ensure that his employees were properly supervised, causing the violation of[] [P]laintiff's right[s]." (Compl. at 25.)  Although it is not entirely clear from the Complaint, this claim is ostensibly based on Superintendent Keyser's failure to prevent his nephew, OSI Keyser, from sexually assaulting Plaintiff and using K-9-05 to violate Plaintiff's religious rights.  (*See* Pl's Opp. 24; Compl. ¶¶ 15, 35–36.)

While Defendants again incorrectly focus on K-9-05 as the alleged constitutional violator, rather than OSI Keyser, (*see* Reply 19), they are correct that Plaintiff improperly relies on supervisory liability.  The Second Circuit has made clear that, in bringing § 1983 actions, plaintiff "cannot rely on a separate test of liability specific to supervisors" and instead, must "establish that [Superintendent Keyser] violated the Eighth Amendment by [his] own conduct, not by reason of [Superintendent Keyser's] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619.  The allegations here, at best, demonstrate Superintendent Keyser witnessed and/or was aware of the alleged sexual assaults and violation of Plaintiff's religious rights, not that he himself participated in those violations.  (*See* Compl. ¶¶ 15, 35–36.)  Because "[a] supervisor's 'mere knowledge . . .' is not sufficient because that knowledge does not amount[ ] to the supervisor's violating the Constitution," *Tangreti*, 983 F. 3d at 618 (citation omitted), Plaintiff's claim against Superintendent Keyer must fail, *see also Williams v. City of New York*, No. 23-CV-2700, 2024 WL 3967307, at *5 n.5 (S.D.N.Y. Aug. 28, 2024) (dismissing a claim asserted against a supervisor "[b]ecause a supervisor's mere awareness of a violation is not enough for individual liability under Section 1983"); *Vaughn v. Baron*, No. 23-CV-1585, 2024 WL 308511, at *3 (D. Conn. Jan. 26, 2024) ("Absent evidence of [the supervisor's] personal involvement in the application of handcuffs on the three inmates who attached [plaintiff], however, the failure to train or supervise does not state a cognizable claim for supervisory liability.").

### III. Conclusion

For the foregoing reasons, Defendants' Motion is denied in part and granted in part.

Defendants' Motion is granted as to Plaintiff's failure to train claims against OSI Keyser and Superintendent Keyser (claims one and seven), Plaintiff's due process claims against Krom

and Venettozzi (claims eight and fourteen), and Plaintiff's deliberate indifference claim against Sipple (claim twelve).  Additionally, Defendants' Motion is granted as to all claims to the extent they are asserted against Defendants in their official capacities.

Defendants' Motion is denied as to all other claims.

If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within thirty days of the date of this Opinion & Order.  *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford Plaintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state claims against Defendants." (alteration adopted) (citation omitted)).  There will be no extensions. Plaintiff is further advised that an amended complaint will completely replace, not supplement, the Complaint.  Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.  If Plaintiff fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Court will hold a telephonic conference on November 12, 2025, at 10:00 AM.

The Clerk of the Court is respectfully directed to terminate the pending motion, (Dkt. No. 88), and mail a copy of this Opinion and Order to Plaintiff.

SO ORDERED.

Dated:    September 18, 2025
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge